**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JOHN DOE,** | |
| *Plaintiff,* | **Civil Action No._____** |
| **v.** | **Hon._____** |
| **UNIVERSITY OF DETROIT MERCY SCHOOL OF DENTISTRY, and UNIVERSITY OF DETROIT MERCY,** | <u>**COMPLAINT**</u> |
| | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

<u>**COMPLAINT AND JURY DEMAND**</u>

Plaintiff John Doe ("Plaintiff" or "John Doe" or "John")[1], by and through his attorneys Nesenoff & Miltenberg, LLP, and Bogas & Koncius P.C., as and for his Complaint, respectfully alleges as follows:

<u>**THE NATURE OF THIS ACTION**</u>

1.      Plaintiff John Doe ("Plaintiff" or "John Doe" or "John"), a student formerly enrolled in a doctoral dentistry program at the University of Detroit Mercy School of Dentistry ("UDM-SOD"), with an expected graduation date in 2022, brings this action against the University of Detroit Mercy ("UDM") and UDM-SOD (together, "Defendants" or the "University") due to his arbitrary dismissal from the program, and the University's egregious lack of any semblance of fair process whatsoever in connection with same.

2.      Without any regard for the applicable policies and procedures, Defendants removed Plaintiff from the University, on the word of an unqualified student and an individual with only a

---

[1] John Doe is a pseudonym. Plaintiff intends to file a motion to proceed under a pseudonym, accordingly.

limited social worker's license, without any investigation or finding of any wrongdoing whatsoever.

3.      Despite Plaintiff's request for reconsideration and an appeal, the University denied John the ever-important appeal hearing.

4.      As a result of the procedurally defective, prejudicial, and arbitrarily inequitable process that was replete with discriminatory bias against Plaintiff's gender and disability, Plaintiff was removed from the program, effectively ending his career as a dentist before it even began.

5.      Based on the foregoing, Plaintiff brings this action for violations of breach of contract and other related causes of action.

## THE PARTIES

6.      At all relevant times, Plaintiff John Doe was and is a resident of the State of California. At all relevant times, Plaintiff John Doe was a student enrolled in the Doctor of Dental Surgery program offered by Defendant University of Detroit Mercy School of Dentistry at the Corktown campus, located just northwest of downtown Detroit, Michigan.

7.      Upon information and belief, Defendant University of Detroit Mercy is a private, non-profit university with an administrative office at 4001 W. McNichols, Detroit, Michigan 48221.

8.      UDM is liable for the conduct, acts, and omissions of all its officers, directors, employees, servants and agents under the doctrine of *respondeat superior.*

9.      Upon information and belief, Defendant University of Detroit Mercy School of Dentistry is the school of dentistry within the University of Detroit Mercy and has an administrative office located at 2700 Martin Luther King, Jr., Blvd., Detroit, Michigan 48208.

## JURISDICTION

10.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states.

11.     This Court has personal jurisdiction over Defendant UDM on the grounds that it conducts business within the State of Michigan.

12.     This Court has personal jurisdiction over Defendant UDM-SOD on the grounds that it conducts business within the State of Michigan.

## VENUE

13.     The conduct alleged herein occurred in Wayne County, Michigan and thus venue is properly before this Court.

14.     Venue for this action is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant University of Detroit Mercy and Defendant University of Detroit Mercy School of Dentistry are considered to reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.     **Background.**

15.     John Doe was enrolled in the UDM-SOD from the fall of 2016 to February 2019 in the Doctor of Dental Surgery program.

16.     At all relevant times, UDM-SOD had in place an "Academic Policies Handbook" ("Handbook") that contained the "official academic policies" for all predoctoral students enrolled in the UDM-SOD. *See* Handbook at title page, available at: https://www.udmercy.edu/academics/catalog/graduate2018-2019/colleges/dental/pdf/UDMSD_Academic_Policies_Handbook_2018-2019.pdf (last visited June 24, 2023).

3.

17.     In the entire two and a half years that John was a student on the UDM-SOD campus, he never violated the UDM-SOD's Professional and Academic Conduct Policy set forth in the Handbook.

18.     During the 2016-2017 academic year, John disclosed to the UDM-SOD that he had Attention Deficit Hyperactivity Disorder ("ADHD").

19.      ADHD is a disability within the meaning of that word under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") for which John required reasonable academic accommodations under applicable law and the Handbook.

20.     In the spring of 2018, John saw a psychiatrist who was recommended to him by UDM-SOD, Dr. James Adamo, for counseling and treatment for his ADHD.

21.     Dr. Adamo prescribed John Mydayis, a prescription medication to treat John's ADHD.

## II.     **During John's Second Year of Studies, He Suffers Side Effects of the Medication Prescribed for His Disability (ADHD).**

22.     In the fall of 2018, John Doe remained enrolled in the dental school program.[2]

23.     John was maintaining a 3.3 GPA and anticipating earning his degree in May 2022,

24.     John was experiencing side effects from the medication Dr. Adamo had prescribed for his ADHD.

25.     Dr. Adamo had prescribed the highest recommended dose of Mydayis which caused John to have episodes of mania and agitation, side effects that affected John's behavior by making him acutely aware, responsive, and overly talkative.

---

[2] By John's own choosing, due to his struggles with ADHD, he audited his second year of dental school in the 2017-2018 school year, and then returned to restart the first year of dental school in the Fall of 2018. Although it marked his third year the UDM-SOD, he restarted his first-year courses at that time.

26.    John's side effects of his medication to treat his ADHD were themselves a disability that required accommodations under the ADA, Section 504, and the Handbook.

**III.    John's Interactions with his Classmates.**

27.    During the fall of 2018, John asked a classmate at UDM-SOD, Jane Roe,[3] on a date.

28.    Jane told John that she was interested in someone else, but she and John remained friendly, both in and outside of school.

29.    On November 8, 2018, John and another female student ("Student 1") engaged in a conversation via WhatsApp about relationships and dating, in which John shared his views on so-called "alpha," "beta," and "omega" males.

30.    On November 17, 2018, John shared a video link with Student 1 to a clip from a movie, "Team America: World Police," an R-rated puppet show on film from Trey Parker and Matt Stone, the creators of the television show, South Park.

31.    A reviewer for THE GUARDIAN has described "Team America: World Police" as an "explosion of hilarious bad taste and ambiguous political satire," "silly and infantile," but "defiantly funny, tweaking the nose of the polite classes with its mad iconoclasm." *See* Peter Bradshaw, *Review,    Team    America:    World    Police,*    (Jan.    13,    2005), https://www.theguardian.com/film/2005/jan/14/team-america-world-police-review.

**IV.    On November 6, 2018, UDM-SOD's New Counselor, Taryn Bailey Andersen, Invites John to Come in for a "Chat".**

32.    Under the Handbook, all students at UDM-SOD "have access to personal counseling and coaching services" at its Office of Health & Wellness.  *See* Handbook at 31-32.

33.    During the 2017-18 academic year, John had taken advantage of these personal counseling services and saw a counselor, Julie Hamilton, LMSW ("Hamilton").

---

[3] Jane Roe is a pseudonym. Plaintiff intends to file a motion to proceed under a pseudonym herewith.

34.     On or around October 2018, UDM hired Taryn Bailey Andersen ("Andersen"), an entry-level social worker with a Masters Social Workers Limited (LMSW) license (i.e., a limited license to practice social work), to replace Hamilton.

35.     Andersen's direct supervisor was Dr. Annamaria Silveri ("Silveri"), Ph.D., the Director of the Personal Counseling & Wellness Center Director.

36.     Silveri was also the head of UDM's Title IX office.

37.     On November 6, 2018, Andersen emailed John and introduced herself as the "new personal counselor for the dental school."

38.     Anderson advised John that she was reaching out to students who had previously seen her predecessor, Hamilton, and invited him "to stop by and chat."

39.     On November 9, 2018, John met with Andersen, and she asked John about his past relationships.

40.     John confided to Andersen about an experience he had in 2013 with a former classmate, while he was an undergraduate at Baylor University.

41.     John told Andersen that he and the classmate had been friends for 18 months when the classmate abruptly and without explanation stopped communicating with him. John told Andersen that, when he finally went to the classmate's place of work to see if she was alright, they had a cordial conversation that lasted, upon information and belief, no longer than approximately five minutes, but that the classmate later made false allegations about him to the Baylor Campus Police, who called John in for 15 minutes of questioning at the campus police facility.

42.     John was hurt and embarrassed by this experience and he shared it with Andersen confidentially, in her capacity as a counselor.

43.     As a student at Baylor University, John had never stalked or harassed the classmate, or anyone else, and he had no Student Conduct Code or Honor Code violations.

**V.     Andersen Conducts an Unauthorized Investigation into John's Background and Falsely Labels John a "Stalker".**

44.     Instead of accepting John's account of what happened between him and the classmate, Andersen erroneously labeled John a "stalker" based on her own prejudices and gender biases.

45.     Andersen initiated her own unauthorized investigation into John's conduct while he was an undergraduate at Baylor University.

46.     On Tuesday, November 13, 2018, Andersen emailed Lynnette Barbera ("Barbera"), a records manager at Baylor University Police Department ("BUPD"), indicating that she was "looking for information related to any past incidents involving stalking, harassing or other prolonged or severe unwanted contact" involving John. Notably, neither Andersen nor John ever used the word "stalking" in discussion.

47.     Upon information and belief, neither Barbara nor anyone else at BUPD confirmed to Andersen that John was involved in stalking or harassment. Regarding her inquiry to BUPD, Andersen stated to John, "we didn't get anything."

48.     Upon information and belief, Andersen also made inquiries of John's classmates and friends at UDM-SOD, and even probed John's WhatsApp and private text messages with his friends and classmates at UDM-SOD, including messages John sent to Student 1 which concerned his views about "alpha," "beta," and "omega" males.

49.     Upon information and belief, Andersen viewed John's expressions of traditional masculinity that he disclosed to her in counseling and his ideas about "alpha," "beta," and "omega"

males, shared in messages and/or texts with Student 1, through her own gender biases and prejudices, and created a false narrative that John was a "stalker."

50.     Upon information and belief, Andersen instigated a baseless no-contact order that prohibited John from having contact with Jane.

**VI.     <u>UDM-SOD Issues a No Contact Order between John and Jane</u>.**

51.     In a letter dated November 14, 2018, Judith Jones ("Dean Jones"), Associate Dean for Academic Administration at UDM-SOD, informed John that she had received allegations that he had violated the Handbook's "Professional Conduct Policy," and that UDM-SOD had issued a No Contact Order ("NCO") between him and Jane, effective that day.

52.     Upon information and belief, the NCO was based on Andersen's false claim that Baylor University had confirmed that John had a police record of "stalking."

53.     John did not receive a copy of the NCO until November 16, 2018.

54.     On November 14, 2018, John and Jane were continuing to socialize as usual. A photo taken that day captured John and Jane standing next to each other, smiling with their classmates.

55.     John was surprised by the NCO since he and Jane had been friendly with each other throughout the semester, both during and outside of class.

56.     UDM-SOD had no objectively reasonable basis to issue John the NCO.

57.     On November 16, 2018, John was provided a copy of the NCO after being summoned for a meeting with Dean Jones and Juliette Daniels ("Assistant Dean Daniels"), Assistant Dean for Student Services & Enrollment Management.

58.     The NCO informed John that he was prohibited from "contact or communication" with Jane including any of the following:

- Visit;
- Call or engage in any direct verbal communication;
- Call or engage in any indirect verbal communication (e.g., voicemail messages);
- Third party communication (e.g. messages sent via friends or other intermediaries);
- Written communication (e.g. email, texting, IM, Twitter, Snapchat, Instagram, or any type social media);
- Walking or sitting in close proximity (e.g. hallways, the dining hall).

**VII.   Dean Jones Counsels John for Sending Student 1 links to "Team America: World Police".**

59.     On or about November 20, 2018, Dean Jones counseled John for sending Student 1 links to "Team America: World Police," prompting John to text Student 1 an apology for sending her the videos.

60.     On information and belief, John's counseling session concerning Student 1 was instigated by Andersen.

**VIII.   John Requests Andersen Refer Him to a Psychiatrist to Treat His ADHD.**

61.     In November 2018, unaware that Andersen had prompted the NCO and counseling session based on her false allegations that he was a "stalker," John continued to see Andersen for one-on-one counseling.

62.     John had been having difficulty making an appointment with Dr. Adamo, whom he had been seeing for both counseling and prescription refills to treat his disability.

63.     John requested that Andersen refer him to a psychiatrist so that he could obtain appropriate treatment for his disability (ADHD) since he was not being effectively monitored and treated by Dr. Adamo.

**IX.   Andersen Refers John to Dr. Silverman and Prepares a "Clinical Summary" in Which She Falsely Labels John a "Stalker".**

64.     On November 20, 2018, Anderson referred John for psychiatric evaluation and treatment by Dr. Mark Silverman, M.D. ("Dr. Silverman"), a Board-Certified psychiatrist.

65.     Andersen prepared a so-called "clinical summary" for Dr. Silverman which she was unqualified to do.

66.     Andersen's purported "clinical summary" made numerous false statements about John, including serious charges of misconduct.

67.     Andersen claimed that "client [John] was brought into the Office of Health and Wellness after several female students expressed concern about client's interaction with another female student." This statement was false. John had voluntarily come in to see Andersen after she introduced herself as the new counselor and invited him to stop by her office for a "chat."

68.     Andersen claimed that "client [John] indicated he was involved in 'stalking' a fellow classmate during his time at Baylor [University]." This statement was false. John had truthfully informed Andersen that his former classmate had misused authorities. Notably, John never once used the term "stalking" to describe the situation, as that was not what occurred.

69.     Andersen claimed that she had "spoken with Baylor campus police and confirmed that an incident did occur and is waiting for the open records request to be processed in order to learn more." This statement was false. John had never been the subject of a report by Baylor University Police.

70.     Andersen made misleading statements that revealed her own values and biases. For example, she stated that John had "made various statements that indicate he believes in traditional, 'hunter-gather' notions of masculinity" and "has repeatedly referred to himself as 'alpha.'"

71.     Andersen's statements in her "clinical summary" reflect the substance of John's messages to his classmate Student 1, seen through the lens of Andersen's own values and cultural and gender biases.

72.     John's WhatsApp chat and private text messages to his classmates contained no objectively abusive language and never promoted male dominance, mass shooting, or Incel. John had no history of violence toward his classmates or anyone and did not own or possess a gun.

73.     Andersen's purported assessment of John as a danger or threat was both false and beyond the scope of her training as a social worker practicing with a limited license.

74.     Andersen overreacted to a conversation she had with John in the realm of client-practitioner counseling and her disclosure of information John shared with her breached her professional ethics and duty of confidentiality.

75.     Andersen did not possess either the training or license to practice as a psychologist and she lacked understanding and professional competency in how men experience masculinity.

76.     The American Psychological Association (APA) "Guidelines for Psychological Practice with Boys and Men" ("APA Guidelines") state that, "understanding how boys and men experience masculinity is an important cultural competency," and that "having adequate knowledge of men's gender role socialization has important implications for psychological practice with boys." *See* APA Guidelines (August 2018) at 4, https://www.apa.org/about/policy/boys-men-practice-guidelines.pdf.

77.     Guideline 9 of the APA Guidelines emphasizes that psychologists should resist imposing "their values and biases on male clients," and instructs that "[g]ender self-awareness may help psychologists recognize when they may be framing a psychological problem from a gendered lens." *See id.* at 18. (Internal citations omitted).

78.     Andersen, who was not a psychologist or even a licensed social worker, imposed her own gendered biases and values on John.

79.     Exceeding her scope of professional competence, Andersen pathologized John's expressions of traditional masculinity and arrived at the erroneous conclusion John was a stalker.

## X.     Dr. Silverman Advises John that the Medication Prescribed for His ADHD was Causing Side Him Side Effects.

80.     John saw Dr. Silverman for the first time on November 20, 2018.

81.     On November 20, 2018, Dr. Silverman advised John that he had been adversely treated for his medical condition by Dr. Adamo and was having side effects from the medication and the dosage Dr. Adamo had prescribed him for his ADHD.

82.     After Dr. Silverman recommended John stop the medication Dr. Adamo had prescribed him, John tapered off the medication and stopped taking the medication completely on January 5, 2019. John did so due to the advice of the medical professionals.

## XI.     John Informs Dean Daniels That a Friend of Student 1 Threatened to Make a False Title IX Report Against Him.

83.     On November 26, 2018, John and a group of female students were engaged in a WhatsApp group chat (online group texting). When two students expressed annoyance with each other's viewpoints, John interjected, "let's all be cool now."

84.     Student 2, a friend of Student 1, reacted to John's effort to keep the peace, responding, "[John] can you just stop."

85.     After John left the group chat, Student 2 boasted to other students in the group chat that she uses Title IX to get what she wants.

86.     On November 27, 2018, John and Student 2 continued their discussion in a private chat. Student 2 accused John of making things worse by injecting himself into the prior day's conversation and for being "disrespectful to most students in our class," and stated that she was "here to call [him] out on it."

87.     John did not understand how he had been "disrespectful" and asked Student 2 what she was talking about.

86.     Student 2 declined to answer John's question and accused him of "targeting people in a class group chat" and threatened to file a complaint against John with UDM-SOD's Title IX office. John responded that this was "ironic" and that he would report her (Student 2) for "threatening [him] with Title IX."

87.     On November 27, 2018, John emailed Assistant Dean Daniels to advise that Student 2 had threatened to make a false Title IX report against him and requested that she contact him.

88.     Dean Jones met with John on Friday, November 30, 2018, to discuss his concerns.

89.     After meeting with Dean Jones, John emailed her and Assistant Dean Daniel screenshots from his WhatsApp chat with Student 2, showing that Student 2 had threatened to make false Title IX complaints against him.

90.     On December 3, 2018, Assistant Dean Daniels emailed John, copying Jones, thanking him for forwarding the screenshots of the WhatsApp text messages and indicating that UDM-SOD was reviewing John's report of "bullying, intimidation, and threatening behavior" against Student 2 and would be following up with him.

**XII.     December 3, 2018:  Dean Jones Repeats False Rumors Started by Student 1.**

91.     On December 3, 2018, John went to meet with Dean Jones to discuss the NCO related to Jane. While waiting outside the office for their meeting, John overhead Dean Jones say to Assistant Dean Daniels that, "[Student 1] told me she thinks he'll do something at the school."

92.     From the context of Dean Jones and Assistant Dean Daniels' ensuing discussion, it was obvious to John that Student 1 was spreading false rumors that he was capable of violence.

93.     After John was ushered into the office, he told Dean Jones and Assistant Dean Daniels that he would never do anything to hurt the school or anyone. Dean Jones asked John not to mention what he heard.

94.     John has never been violent and has never threatened physical violence to anyone at UDM-SOD or anywhere else.

### XIII.   On December 6, 2018, Silveri and Andersen Urge Dr. Silverman to Declare John "Unfit" and Proceed to Force John to Take an "Involuntary Leave of Absence".

95.     Unaware of Andersen's involvement with the NCO and Student 1's false rumors about him, John continued to see Andersen for counseling.

96.     On December 6, 2018, Andersen invited Silveri to join her counseling session with John.

97.     Silveri questioned John about the alleged "stalking" incident at Baylor University.

98.     John corrected Silveri, telling her that he had not "stalked" his former classmate at Baylor and explaining that it was the classmate who had harassed *him* by misusing authorities.

99.     That same day, Andersen left numerous messages for John's psychiatrist, Dr. Silverman, including a voice mail message asking if Dr. Silverman had decided to move forward with "involuntary hospitalization."

100.    Silveri asked Dr. Silverman if he could write a letter stating that John was "unfit" for dental school.

101.    Dr. Silverman had evaluated John on November 20, 2018, as part of John's ongoing treatment for his ADHD, and had not found him unfit for dental school.

102.    When Dr. Silverman informed Silveri that he would not write a letter stating that John was "unfit" for dental school because he had made no such determination, Dr. Silveri responded, *"we will proceed with an involuntary leave of absence."*

103.    Dr. Silveri was not John's treating physician, and she had no information to support John's "involuntary leave of absence" from UDM-SOD.

**XIV.    On December 12, 2018, John Receives Notice of An Unfounded Complaint.**

104.    On December 12, 2018, John received a letter from Dean Jones, informing him that "a formal complaint" had been filed with the Office of Academic Administration, alleging his "involvement in professional misconduct," specifically, "bullying, intimidation, misuse of social media, as reported by DS1 classmates" based on his "What's App and text messages."

105.    Upon information and belief, the investigation into John's conduct was based on false claims by Student 2, who had earlier threatened to weaponize Title IX against him, which he had reported to Dean Jones.

**XV.    On December 12, 2018, Jane Sits Next to John During an Exam, Violating the NCO.**

106.    John took his final exam on December 12, 2018.

107.    During the exam, Jane took a seat behind John.

108.    Jane and John both violated the terms of the NCO on December 12, 2018 by virtue of their proximity to each other during the exam.

**XVI.    Dean Aksu *"Grants"* John A So-Called "Involuntary" and "Indefinite Leave of Absence" That John Never Requested.**

109.    On December 24, 2018, John received a letter dated December 20, 2018 from Mert N. Aksu ("Dean Aksu"), DDS, Professor and Dean of UDM-SOD, placing John on an involuntary leave of absence, allegedly for violating the NCO on December 12, 2018 and exhibiting unusual behaviors.

110.    Dean Aksu copied Andersen on this letter.

111.    Dean Aksu's letter informed *John that,* "[e]ffective immediately, [he] [was] being placed on an indefinite leave of absence" and that "the rationale for the leave includes ***repeated episodes of behavior*** demonstrating lack of Fitness for the Profession."

112.    Dean Aksu's letter advised John that he had failed to meet "expected standards for Fitness for the Profession," and cited the entire list of guidelines of the School of Dentistry's 2018-2019 Academic Policies Handbook, *see* **Handbook** at 116, and the Handbook's "definitions" of Fitness for Profession, *see id.* at 116-117.

113.    Dean Aksu's letter went on to state that:

In particular, members of the school community have reported the following behaviors:

- Violation of a no contact order initiated November 11, 2018 in addition to other unexplained behaviors inconsistent with the expected standards for Professionalism and Fitness for the Profession.

The Dean of the School of Dentistry has the discretion to grant a leave of absence. The decision to grant you an indefinite leave of absence is based on a number of factors including, but not limited to issues related to your Fitness in the Profession, your well-being and the School of Dentistry academic environment.  Your ability to return to the School of Dentistry as a dental student is also within my discretion as Dean.

114.    John did not understand why he was being effectively barred from campus.

115.    Dean Aksu's letter did not identify with any specificity what he was referring to by John's allegedly "repeated episodes of behavior," or explain how John's alleged "episodes of behavior" had violated the "expected standards for Professionalism and Fitness."

116.    John was also unclear what standards for Professionalism and Fitness he had purportedly violated with respect to the NCO.

117.    Dean Aksu's statement that he had "discretion ***to grant*** an indefinite leave of absence" made no sense and was incomprehensible since John had ***never requested*** to take a leave

16.

of absence or a physical or mental health separation from the UDM-SOD, pursuant to the Handbook. *See* Handbook at 130-131.

**XVII.  On December 26, 2018, John Writes To The Dean Stating That An "Involuntary, Indefinite" Leave Is Tantamount To Dismissal From Dental School.**

118.    On December 26, 2018, John wrote a letter to Dean Aksu, in which he explained that placing him on involuntary indefinite leave was tantamount to terminating him from dental school because John would be dismissed if he missed more than a few days of school in the upcoming session.

119.    John acknowledged that both he and Jane had violated the NCO by sitting in proximity to each other during the exam but stated that he was "fit to be a professional."

**XVIII.  On January 10, 2019, John Writes Dean Aksu to Inform Him that the Side Effects He Suffered from Medication for His Disability Were Resolved.**

120.    On January 10, 2019, John again wrote Dean Aksu.

121.    John informed him that Dr. Silverman had properly diagnosed side effects he had suffered as a result of the mediation prescribed by Dr. Adamo for his ADHD.

122.    John informed Dean Aksu that Dr. Silverman had recommended that John take a medical leave of absence from school to receive the correct medication regimen.

**XIX.  Dr. Silverman Implores Dean Aksu to Provide John a Reasonable Accommodation to Continue His Education.**

123.    On January 12, 2019, Dr. Silverman emailed Dean Aksu to request that UDM-SOD implement an accommodation for John's "disabling medical condition."

124.    Dr. Silverman noted that, "[John] had a longstanding history of ADHD and Obsessive Compulsive Disorder ("OCD"), and that John's behavioral symptoms in the fall of 2019 (agitation and mania) were side effects of medication taken for his disability, namely, a "whopping dosage" of Amphetamine."

17.

125.    Dr. Silverman further noted that, after stopping "any and all Amphetamines on January 4, 2018," John's "demeanor, mental status and presentation [had] all improved dramatically," and he was no longer experiencing the "extreme side effects" of Amphetamine medication.

126.    Dr. Silverman's letter also indicated that John's diagnosis of Social (pragmatic) Communication Disorder ('SCD'), which involves difficulties in social communication and interaction that "satisfy Criteria A of Autistic Spectrum Disorder," impairs a person's ability to communicate socially and conform to appropriate communications that match social context.

127.    Dr. Silverman implored Dean Aksu that students must be given reasonable accommodations to provide an equal opportunity for pursuing an education.

128.    Dr. Silverman noted in his letter to Dean Aksu that SCD is a recognized disorder in Diagnostic and Statistical Manual of Mental Disorders (DSM-5).

129.    SCD is a "disability" within the meaning of both the ADA and Section 504, as are John's ADHD and John's side effects from the medication he was prescribed ADHD.

**XX.    Two Days Later, Dean Aksu Claims to Be Unable to Open Dr. Silverman's Emailed Letter Then Later Asserts that John Is Not an "Enrolled" Student.**

130.    On January 14, 2019, at 1:53 p.m., Dean Aksu claimed that he was unable to open Dr. Silverman's email, and emailed Dr. Silverman that, *"we cannot validate the source of this email and I am unable to open the attachment provided with your email."*

131.    On information and belief, Dean Aksu's statement to Dr. Silverman that he was "unable to open" Dr. Silverman's email was disingenuous if not an outright lie.

132.    At 1:58 pm, just five minutes after emailing Dr. Silverman that he supposedly was "unable to open" Dr. Silverman's attached letter, Dean Aksu emailed John, advising him that he

was standing by his decision of an "indefinite leave of absence" based on his purported "lack of Fitness for the Profession."

133.    On January 14, 2019, at 3:37 p.m., Dr. Silverman emailed Dean Aksu that he had *faxed* him a copy of the letter and that he had also *copied and pasted his entire letter into the body of his email*, making it impossible for Dean Aksu to claim that he was unable to access Dr. Silverman's letter.

134.    However, ten minutes later, at 3:47 p.m. on January 14, 2019, Dean Aksu emailed Dr. Silverman confirming that his correspondence had been received, but falsely asserting that John was *"not an enrolled student at the [UDM-SOD]."*

### XXI.    John Writes Dean Aksu to Reiterate the Request for an Accommodation for His Disability and to Clarify His Enrollment Status With the School.

135.    In a letter dated January 17, 2019, John wrote Dean Aksu, stating that, since receiving Dean Aksu's letter dated December 20, 2018, he had undergone "extensive evaluation" by Dr. Silverman.

118.    John stated that the medication he was prescribed for his disability the prior semester did cause side effects, but that he no longer had those side effects.

136.    John reiterated Dr. Silverman's request that he be allowed to continue dental school since he was clear of the drug induced behavioral side effects from the treatment for his disability.

137.    John's request to Dean Aksu constituted a reasonable request for accommodation under the Handbook.

**XXII.  On January 18, 2019, Dean Aksu Dismisses John from UDM-SOD For a So-Called "Pattern of Conduct," and on January 20, 2019, John Requests an Appeal.**

138.    In a letter dated January 18, 2019, Dean Aksu responded to John's letter "that he had "no alternative but to dismiss [John]" based on "faculty and administrators' observations of [his] pattern of conduct."

139.    On January 20, 2019, John wrote Dean Aksu, requesting that he please reconsider his decision to dismiss him, noting that his behavior had not been an issue for his first two years as a student, and that he was doing well with appropriate treatment and monitoring by Dr. Silverman for his disability.

140.    John also requested an opportunity for appeal, as provided for under the Handbook.

141.    John further noted that he felt the dean's advisors may have relied on hearsay when they reached the opinion that he was "unfit," since he had overheard Dean Jones and Ms. Daniels saying that [Student 1] thought he was a "danger" and "could harm the school."

142.    John noted in his letter to the dean that, no healthcare professional had ever said that John was a threat or a danger to UDM-SOD.

**XXIII. On February 12, 2019, John's Appeal of The Dean's Decision Is Denied By The Dean's Appointed "Appeals Review Committee" Without A Hearing.**

143.     In a letter dated January 25, 2019, Dean Aksu advised John that he had appointed an Appeals Review Committee to consider John's request for an appeal.

144.    In a letter dated February 3, 2019, John responded that he objected to the appointment and review of the Dean's decision by the Appeal Review Committee as it was inconsistent with the procedures set forth in the Handbook.

145.     John pointed out that he had never been offered an opportunity to have an officially comprised Standing Academic Performance Committee ("APC") to review his fitness for the profession, as required by the Handbook. *See* **Handbook** at 117.

146.     In a letter dated February 12, 2019, David Kacir, whom Dean Aksu appointed as "Committee Chairperson," denied John's request for an appeal hearing, and erroneously averred that "proper protocol was followed."

### XXIV. <u>Violations of Agreements, Representations, Covenants, and Warranties Between UDM-SOD and Plaintiff.</u>

147.     UMD-SOD violated numerous agreements, representations, covenants, and warranties with Doe as set forth in the Handbook.

#### a. **Forcing John to take an "Involuntary and Indefinite "Leave Of Absence" Violated His Right To Be Free From Arbitrary Dismissal.**

148.     The Handbook's "Leave of Absence Policy" authorizes the Dean of the UDM-SOD discretion to grant a leave of absence ***only upon a written request of the student***, and only ***after*** consideration of the effect of the leave on the student's academic program and status. *See* **Handbook** at 130.

149.     The Dean has no discretion under the Handbook *to force* a student to take a so-called "indefinite leave of absence," as outlined in Dean Aksu's letter to John.

150.     The Handbook also makes no mention of an "indefinite" leave of absence, and specifically provides that leaves of absence, which are *at the request of the student*, are for a maximum period of one academic year. *See id*.

151.     Finally, when the Dean grants a *student's request* for a "leave of absence," the Dean must advise the student of any conditions for reinstatement. *See id*.

152.    The Handbook provides a separate, non-disciplinary provision titled "Physical and Mental Health Separation." *See id.* at 131.

153.    Under this section, *"[w]hen a student's physical or mental health behavior threatens his or her welfare, disrupts or threatens the campus community or makes excessive demands on its staff and/or resources,"* the Dean has discretion to request a student to undergo an examination by a medical doctor and/or a psychiatrist and to take under the advisement the recommendation and, if necessary, call for the separation of the student on medial or mental health grounds. *See id.* at 131.

154.    To the extent that the Dean wanted to remove John from campus for a non-disciplinary reason, (i.e., an investigation "for purposes of obtaining a medical, psychiatric or psychological evaluation") the Handbook would have given him discretion to take such action, providing that the "Associate Dean for Academic Administration [had] determined that there [was] *reasonable cause* to believe" that John's "continued presence . . . in class, clinic or on the University campus pose[d] a threat or risk to him/herself, to patient or to others, or to the stability of normal University classes, clinic or functions." *See id.* at 122-123 (emphasis added).

155.    However, in Dean Aksu's December 20, 2018 letter, the dean declared that the reason for the so-called "indefinite leave of absence" was due to John's *"lack of fitness for the profession."*

156.    Under the Handbook, "[s]tudents who engage in professional or academic misconduct, or who are deemed unfit for the practice of dentistry, are subject to *discipline*," <u>not</u> leaves of absence. *See id.* at 117 (emphasis added).

157.    The Handbook's "Attendance Policy" mandates student attendance and explicitly states that: "[a]ttendance at scheduled classes, laboratory sessions, clinical assignments, and

community rotations is mandatory, unless expressly indicated otherwise by the course director in the written syllabus." *See id.* at 126 (emphasis in original).

158.     By imposing on John a so-called "indefinite leave of absence," Dean Aksu effectively dismissed John from UDM-SOD *without a hearing* by forcing him to miss the upcoming academic session, in violation of John's rights under the Handbook.

159.     While the Handbook gave Dean Aksu discretion to discipline John or to ensure the safety of the campus community, he had no discretion to impose on John a forced "indefinite leave of absence."

**b. Failure to Provide John an Accommodation for His Disability.**

160.     The Handbook has a section titled "Accommodations for Students with Disabilities." *See id.* at 23. In pertinent part, this section provides:

> **ACCOMODATIONS FOR INDIVIDUALS WITH DISABILITIES**
> **Accommodations for Students with Disabilities**
> The University of Detroit Mercy is committed to assisting students with disabilities to receive reasonable and appropriate learning or other accommodations to ensure their equal access to a full learning experience. This is supported by the Mission of the University and is in compliance with the Americans with Disability Act (ADA) of 1990, as amended in 2008, and Section 504 of the Rehabilitation Act of 1973. All students, including those with disabilities, must be capable of meeting the technical standards and essential functions, and other essential requirements of their programs, with or without accommodations. In order to receive accommodations, students should contact the Disability Support Services (DSS), as soon as possible after being admitted, to learn of the of the necessary steps for requesting accommodations.

*See id.* at 23-24.

161.     Under the Handbook, "[a]n accommodation plan is always individualized based upon a student's disability and needs, and accommodations must be reasonable and appropriate to meet those needs." *See* Handbook at 23.

162.    John had his disability (ADHD) on file with Disability & Accessibility Support Services, as required under the Handbook, to ensure that UDM Dental was aware of his disability and that he was entitled to an accommodation.

163.    On January 12, 2019, Dr. Silverman emailed Dean Aksu, requesting that UDM-SOD implement an accommodation for John's "disabling medical condition."

164.    At all relevant times, UDM-SOD was aware that John had a longstanding history of ADHD.

165.    Dr. Silverman implored UDM-SOD to provide John a reasonable accommodation to permit him to continue to pursue his education, given that the symptoms he suffered (agitation and mania) in the fall of 2019, had been induced by a "whopping dosage" of Amphetamine, and that, after stopping "any and all Amphetamines on January 4, 2018," John's  was no longer experiencing the "extreme side effects" of Amphetamine medication.

166.    Side effects of medications prescribed for a known disability can themselves constitute a disability for which a school must made academic accommodation.

167.    Given that John was a student with a disability within the meaning of that term as provided in the Handbook and given that he was capable of meeting the technical standards and essential functions, and other essential requirements of the dental program, with or without accommodations, USM-SOD was required to afford him a reasonable academic accommodation to ensure his equal access to an education.

### c. Andersen's Unprofessional Breach of Confidentiality.

168.    The Handbook promised students that UDM-SOD's Office of Health & Wellness was a resource for no-cost counseling "for all students," and that any walk-in counseling services

they availed themselves of would be provided "in an ethical and confidential manner." *See id.* 31-32.

169.    As a counselor in possession of a limited license to practice as a social worker, Andersen was subject to professional rules of practice. Andersen had a duty to maintain confidentiality, as set forth under Michigan law, *See* Mich. Comp. Laws § 330.1748.  This section mandates that "[i]nformation . . .  acquired in the course of providing mental health services to a recipient, shall be kept confidential," and may only be disclosed under statutorily specified circumstances, none of which apply in this case. *See id*.

170.    In breach of her duties of professional practice, Andersen disclosed confidential information John shared with her during their counseling sessions; and, on information and belief, Andersen filed a false report to UDM-SOD's Office of Academic Administration that labeled him a "stalker," an assessment outside of her clinical expertise or training, based on her gender biases and personal values and ideas about "masculine" behavior and norms.

171.    Andersen had no good faith, objectively sound reason to believe that John was a "stalker" or to discount John's account of his past relationship with a student at Baylor University. Andersen never witnessed any behavior by John which she could believe in good faith violated the Handbook's academic or professional misconduct policy or that constituted professional misconduct under the Handbook.  *See* Handbook at 117-119.

### d. Denial of John's Due Process and Appeal Rights Under the Handbook.

172.    Pursuant to the Handbook, the functions of an Academic Performance Committee ("APC") includes making "recommendations to the Associate Dean for Academic Administration and/or the Dean regarding students who may lack fitness for the profession." *See* Handbook at 101, 116. An APC exists for each class (DS1, DS2, DS3, and DS4). *See id*. at 101.

173.     The Handbook sets forth specific requirements for the composition of the APC for Dental Students, (providing that the committees be composed of course directors or their informed designee(s), and chaired by the Associate Dean for Academic Administration (or his/her designee, who attends in a non-voting capacity)), the committees' procedural operation, and the subject matter of the APCs' recommendations to the Associate Dean for Academic Administration and/or Dean.  *See id*. at 101-102.

174.     Pursuant to the Handbook, if the APC is considering recommending dismissal, the APC Chair will notify the student by email that a Special APC Meeting will be held, at which the student is entitled to present "significant information relative to the recommendation under consideration."  *See* Handbook at 106-107.  In pertinent part, the Handbook provides:

### V. SPECIAL APC

If the APC is considering recommending to the Dean that a student . . . be dismissed, the APC Chair will notify the student by email and in their DETROIT MERCY DENTAL mailbox, that a Special APC Meeting will be held. This meeting will be held not earlier than five (5) academic days from the day the letter is mailed unless all parties involved agree upon an earlier date. The letter will inform the student of the date, time and place of the meeting and of his/her right to bring his/her faculty advisor or another faculty member to the meeting.

A majority of members or their designees will constitute a quorum. When a quorum is present, a simple majority of those present will approve decisions. Each member of the Committee will be entitled to one vote. Co-directors for courses will determine which course director votes, with only one vote allowed for each course. The chairperson is entitled to vote only in the case of a tie.

***The purpose of the Special APC Meeting is to allow the student to present significant information relative to the recommendation under consideration, which the committee may not otherwise possess. The meeting is not to appeal any decisions (since they have not been made),*** nor is it intended to be the forum or process for an appeal of a grade. ***The student should prepare an opening statement providing significant information the student determines is important relative to the recommendation.*** The committee members may ask questions of the student. At the end of the presentation and questions, the student, and his/her representative will leave the meeting.

***Following the meeting, the Special APC will deliberate and then forward the formal recommendation to the Dean.*** If the APC does not vote to recommend a . . . dismissal, the Associate Dean for Academic Administration, or designee, will inform the student of the Committee's decision and if, appropriate, recommendations for progress. In case of the Dean's absence, his/her designee will act in the Dean's behalf.

***The Dean may agree with the decision of the Special APC or make an alternative decision, including reversal or modification of the recommendation***. The Dean's decision will be sent in writing to the student and the Associate Dean for Academic Administration within five (5) academic days after the Special APC recommendation. ***Reasons for any decision, which is different than the Special APC's recommendation, will be included in the notification that is sent.*** The committee members will be informed if a decision which is different than the Special APC's recommendation.

*See* Handbook at 106-107 (emphases added).

175.    Under the Handbook, Dean Aksu was not granted discretion to make a final determination whether John lacked professional fitness, absent an initial meeting between John and the APC, in which John could present *"an opening statement providing significant information"* to the committee in his defense. Any final decision by Dean was required under the Handbook to have been in consultation with the appropriate Associate Dean and course directors, *see id.* at 101, 116, and the reasons for any reversal or modification of the APC's decision by the Dean needed to be stated in writing. *See id.* at 106-107.

176.    With respect to appeal rights of the Dean's decision, pursuant to the Handbook, if the student disagrees with the decision of the Dean, the student has a right to request an appeal hearing based on specified criteria. *See id.* at 107. This section provides:

## VI. GUIDELINES FOR APPEALS

A.   The decision of the Dean may be appealed by the student. The student must submit a letter containing supportive documentation to the Dean stating the reason(s) for the appeal no later than five (5) academic days after the Dean mails the decision. The request for appeal must specify the basis for the appeal, including any of the following which the student believes apply:

      1.   Substantial evidence not previously considered;

2. Evidence of bias by a Special APC member;
3. Significant errors in procedures by the Special APC;
4. Significant findings of inequity

B. Within five (5) academic days following receipt of the written appeal, the Dean will appoint an Appeals Review Committee composed of three faculty members who did not participate in the decision being appealed. The Dean will name the Chairperson of the Appeal Committee.

C. The Appeals Review Committee will meet within five (5) academic days to review the request and make a determination as to whether or not an appeal hearing will be granted. ***The review will include examination of the appeal request and the minutes of the Special APC Meeting***. The Appeals Review Committee will determine whether to grant the request for an appeal hearing. The Committee's decision as to whether to grant a request for an appeal hearing is final.

D. Should the Appeals Review Committee grant the request for an appeal hearing, they shall become the Appeals Committee, and, within five (5) academic days after granting the request will convene an appeals hearing. The student may invite a Faculty Advisor, the Assistant Dean of Student Services and Enrollment Management, or a faculty person to attend the Appeals meeting. The Chair of the Appeals Committee shall limit discussion to only those issues contained in the appeal request. The Appeals Committee shall hear any new information presented by the student. The Appeals Committee may seek other information or may recess and reconvene as it deems necessary. The student and Faculty Advisor, Assistant Dean of Student Services and Enrollment Management, or a Faculty Advocate may be present at times when new information is presented.

E. The Appeals Committee shall deliberate the Dean's decision in light of the appeals hearing and shall decide to:
1. Uphold the Dean's decision;
2. Reverse the Dean's decision, or;
3. Modify the decision.

F. The Appeals Committee's decision will be transmitted to the Dean, in writing, within five (5) academic days of reaching its decision. The Dean will review the Appeals Committee's decision and will convey the decision to the student and to the Special APC within seven calendar days upon receipt. If there is a reversal or modification of the Dean's decision, the Associate Dean for Academic Administration and the Dean will determine the steps necessary to satisfy the reversal or modified decision in a reasonable and timely manner.

G. The Appeals Committee decision in the matter shall be final and shall be implemented immediately.

*See id.* at 107-108.

177.    Under the Handbook, John's appeal rights *presupposed* his right to have an initial meeting with the APC prior to the underlying decision by the APC, and certainly prior to a final decision by the Dean.

178.    John was denied his right to a meeting with the APC, and the Dean's summary decision left him without any capacity to present his side of the story. In violation of John's rights to due process under the Handbook, the Dean made his decision in secrecy, and there was no deliberation, no meeting minutes, no transcript, or any committee report with findings and conclusions. John could only speculate from the Dean's vague letter what had been the *reason(s)* for his summary dismissal by the Dean on December 20, 2023.

### e. John's Right to Continue Attending School During the Pendency of His Appeal.

179.    Finally, under the Handbook, students subject to dismissal based on a lack of professionalism who exercise their right of appeal are generally entitled to continue attending classes and laboratories during the appeal process, absent a determination by the Associate Dean for Academic Administration and the Dean that "there is reasonable cause to believe that the continued presence of a student in class, clinic or on the University campus poses a threat or risk to him/herself" to others, or to the campus. *See* Handbook at 113. This section provides:

**VII. CONTINUATION IN SCHOOL DURING APPEALS**
Students who decide to appeal decisions of repetition of a year, part of the year or dismissal may continue attending classes and laboratories during the appeal process. Students who decide to appeal a decision which requires repetition of a year, part of a year or dismissal, may be allowed to continue attending classes, laboratory sessions and/or clinic during the appeal process, however the Associate Dean for Academic Administration and the Dean need not allow such continued attendance if they determine that there is reasonable cause to believe that the continued presence of a student in class, clinic or on the University campus poses a threat or risk to him/herself, to patients or to others, or to the stability of normal University classes or functions. If the student is permitted to continue attending classes, laboratory sessions and/or clinic during the appeal process, the School can require that attendance is subject to specified conditions, such as suspension from patient care, receiving professional counseling, anger management courses, or a

medical, psychiatric or psychological examination, meeting with designated faculty on a scheduled basis, etc. If the appeal occurs during the final examination period or during the period in the academic calendar in which final grades would be reported, the Associate Dean for Academic Administration may hold final grades in abeyance until a decision is made. No remedial instruction will be provided until the outcome of the appeal is known.

*Id.*

180.    Here, there was *no reasonable determination* by the Dean or the Associate Dean that John posed a threat to himself or anyone else.

181.    The only persons who appear to have made a determination that John presented a threat were Andersen and Student 1, both of whom lacked the clinical experience and training to make such a determination.

182.    Importantly, no *physician* who had been involved in John's care had determined that John posed a threat to himself or others or to UDM-SOD.

**XXV.   Damages to John.**

183.    Plaintiff Doe has already suffered and will continue to suffer significant damages as a result of UDM's unlawful, unfair, and improper conduct.

184.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with UDM-SOD's promises to Plaintiff as an enrolled student and principles of good faith and fundamental fairness.

185.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff was wrongly removed from his studies at UDM-SOD to become a dentist—his lifelong dream—effectively ending his dental career before it ever began.

186.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff has wrongly been labeled as "stalker" and his records permanently bear a notation stating that he was removed from UDM.

187.     As a result of Defendant's unlawful, unfair, and improper conduct, Plaintiff will likely lose the opportunity to ever become a dentist.

188.     Unlike with undergraduate institutions, it is nearly impossible to transfer to another dentistry institution, even absent a mark on one's record.

189.     In fact, it is the policy of many dental schools that they do not accept transfer students.

190.     As a further result of UDM-SOD's breach of its contractual obligations, Plaintiff suffered emotional distress and anxiety.

## COUNT ONE
## BREACH OF CONTRACT
### (As to Defendants UDM and UDM-SOD)

191.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

192.     "When a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature." *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 284–85 (6th Cir. 2019) (internal citation and quotation marks omitted).

193.     At all relevant times, a contractual relationship existed between UDM-SOD and John by virtue of John's enrollment at UDM-SOD and as defined through UDM-SOD's policies and procedures, set forth in the Handbook, including, *inter alia*, detailed policies and procedures governing student discipline, leaves of absence, reasonable accommodations for disabilities, and determinations of professional fitness.

194.     Through these policies, UDM-SOD provided specific, enforceable provisions outlining certain procedures that were to be followed by the institution before John could be dismissed for lack of fitness, for violation of a university policy, or violation of the NCO.

195.     Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of UDM-SOD's contract with its student, John.

196.     Accordingly, through the documents it publishes and provides to students, UDM-SOD makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the policies.

197.     Under Michigan law, to establish a breach of contract, a plaintiff must establish that (a) there was a contract between himself and another party; (b) that the other party breached the contract; and (c) that the plaintiff suffered damages as a result.  *See McInerney v Detroit Trust Co*., 279 Mich 42 (1937); *see also Atria v. Vanderbilt Univ.*, 142 Fed. Appx. 246, 255 (6th Cir. 2005).

198.     Based on the aforementioned facts and circumstances, UDM-SOD created express and implied contract when it offered, and John accepted, admission to UDM-SOD, and when John's payment of the required tuition and fees was accepted by UDM-SOD.

199.     As set forth in the foregoing paragraphs, UDM-SOD committed several breaches of its agreements, representations, covenants, and warranties with John including, *inter alia*, the following:

### A.  *UDM-SOD breached its obligations under the Handbook's "Academic Performance Committees (APC) Policy and Procedures."*

200.     As set forth in the foregoing paragraphs, under the Handbook's "Academic Performance Committees (APC) Policy and Procedures," UDM-SOD had an obligation to provide John an opportunity to meet with the APC and to "prepare an opening statement providing

significant information the student determines is important relative to the recommendation" of dismissal. *See supra* ¶¶ 172-174.

201.    Instead of providing John with this opportunity to tell his side of the story and meet with the committee, UDM-SOD breached its obligation by imposing on him an involuntary "indefinite leave of absence," a disciplinary action that is not available under the Handbook.

202.    Had UDM-SOD adhered to the published procedures, John would have had an opportunity to present the mitigating circumstances relating to the inappropriate medication he had been prescribed for his disability.  John would also have had an opportunity to demonstrate to the committee that he posed no threat to the campus.

**B.  UDM-SOD breached its obligation to permit John's right to "Continuation in School During Appeals," pending the appeal of his dismissal for lack of fitness.**

203.    As set forth in the foregoing paragraphs, pursuant to the Handbook's "Academic Performance Committees (APC) Policy and Procedures," a student for whom the APC must render a recommendation to the Dean on whether to dismiss a student for unfitness, the student has a right to continue in school pending any appeal of such decision.  *See supra* ¶¶ 172-174.

204.    The Handbook explicitly provides that "students who decide to appeal decisions of . . . dismissal may continue attending classes and laboratories during the appeal process."  *See supra* ¶ 179.

205.    The only exception to this right to continue in school pending an appeal is if the Associate Dean for Academic Administration and the Dean find that there is "reasonable cause to believe that the continued presence of a student" presents a "threat or risk" to himself, others, or the university. *See id.*

206.    As John posed no reasonable threat of potential harm to himself, others, or the university, he should not have been summarily dismissed (or placed on so-called "indefinite leave of absence") by Dean Aksu, pending the outcome of his appeal.

**C.    UDM-SOD breached its obligations under the Handbook's policy to provide "Accommodations for Students with Disabilities."**

207.    As set forth in the foregoing paragraphs, under the Handbook's published policy to provide "Accommodations for Students with Disabilities," UDM-SOD promised to provide reasonable accommodations for students with "disabilities" within the meaning of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). *See supra* ¶¶ 160-161.

208.    John's ADHD and "Social (pragmatic) Communication Disorder ('SCD')" are disabilities within the meaning of the ADA and Section 504.

209.    When John substantiated through his doctor that his medication was causing him side effects, those side effects themselves constituted a disability of which UDM-SOD had notice.

210.    Under UDM-SOD's stated policies and procedures, *"an accommodation plan is always individualized based upon a student's disability and needs, and accommodations must be reasonable and appropriate to meet those needs*."

211.    UDM-SOD's refusal or failure to provide John an accommodation in this case by allowing him a leave of absence in which to clear himself of the drug rather than a punitive and involuntarily imposed "indefinite leave of absence" was in breach of the University's obligations.

212.    As a direct and proximate cause of the above conduct, Doe has sustained tremendous damages including, without limitation, emotional and psychological distress, loss of educational and extracurricular opportunities, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

**COUNT TWO**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
(As to Defendants UDM and UDM-SOD)

213.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

214.    Under Michigan law, the violation of the implied covenant of good faith and fair dealing is an independent claim in addition to breach of contract. *See Home Owners Ins. Co. v. ADT LLC*, 109 F. Supp. 3d 1000 (E.D. Mich. 2015) (applying Michigan law).

215.    "Michigan recognizes that an enforceable implied covenant of good faith and fair dealing arises when one party to a contract makes its performance a matter of its own discretion," either where "the parties have agreed to defer decision on a particular term of the contract, or from a lack of clarity or from an omission in the express contract." *Interquim, S.A. v. Berg Imports, LLC,* No. 21-10665, 2022 WL 790802, at *3 (E.D. Mich. Mar. 14, 2022), *reconsideration denied,* No. 21-10665, 2022 WL 2230438 (E.D. Mich. June 21, 2022) (internal citations and quotation marks omitted); *see also Stryker Corp. v. XL Ins. Am., Inc*., No. 1:17-CV-66, 2018 WL 3950899, at *9 (W.D. Mich. Aug. 17, 2018) (same interpretation of Michigan law); *Burkhardt v. City Nat.* Bank of Detroit, 57 Mich. App. 649, 652, 226 N.W.2d 678, 680 (1975) (Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith.");  *Harp v. Equilon Enterprises, L.L.C*., No. 302084, 2012 WL 975050, at *6 (Mich. Ct. App. Mar. 22, 2012) (same).

216.    Where there are no guidelines in the Handbook to govern Defendants' discretion, they had a duty to perform their promises in a careful and skillful manner, without risk of harm to others and in good faith.  *See Harp*, 2012 WL 975050, at *6.

217.    Here, UDM-SOD breached its duty of good faith and fair dealing in the following ways:

a.  Through its failure to render counseling services to John in an ethical and confidential manner, *see supra* ¶¶ 44-50, 66-79, 168-171;

b.  Through its dishonesty in dealing with a student's physician in matters pertaining to reasonable accommodations, including, *inter alia,* feigning inability to open Dr. Silverman's January 14, 2019, email to Dean Aksu, in which Dr. Silverman implored the Dean to provide John a reasonable accommodation, and Dean Aksu's false response to John's physician that John was *"not an enrolled student," see supra* ¶¶ 130-134;

c.   Abusing the Dean's discretion to take action to discipline students or to ensure the safety of the campus by imposing on John an *extracontractual involuntary "indefinite leave of absence." See supra* ¶¶ 95-103, 109-117, 200-202.

218.    As a direct and proximate cause of the above conduct, Doe has sustained tremendous damages including, without limitation, emotional and psychological distress, loss of educational and extracurricular opportunities, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT THREE
## BREACH OF IMPLIED UNDERSTANDING PRECLUDING ARBITRARY DISMISSAL FROM DEGREE PROGRAM
### (As to Defendants UDM and UDM-SOD)

219.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

220.    "[W]hen one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." *Booker v. Grand Rapids Med. College,* 156 Mich. 95, 99-100 (1909).

221.    Once a student enrolls in college, pays his or her tuition, and the school receives and accepts payment, the parties enter into "a mutual understanding" that the student's earned

academic credit "will not be made fruitless, a graduation and a degree made impossible, by an arbitrary refusal to permit further attendance." *See id.*

222. "In this understanding there is no want of mutuality. There is no want of good and valuable consideration. There is written evidence of it in the articles of association and the prospectuses of respondent and in the rolls of the college in which relators's names are entered as matriculates." *Id.*

223. Accordingly, in *Booker v. Grand Rapids Med. College*, where state law mandated that the course of study to obtain a medical degree could not be completed in less than three years, students were entitled to rely on the *"implied understanding" that they could not be arbitrarily dismissed"* by a private, for-profit school medical school, *id.* at 100, *during their second year*. *Id.* at 97 (holding that students could not be arbitrarily dismissed solely because they were Black, regardless of pressure exerted by students who were not Black).

224. Here, the contractual nature of the relationship between Defendant and Plaintiff and their mutual understanding likewise precluded Plaintiff's arbitrary dismissal in his second year from continued enrollment in his doctoral program. *See Carlton v. Trustees of Univ. of Detroit Mercy*, No. 225926, 2002 WL 533885, at *3 (Mich. Ct. App. Apr. 9, 2002) ("implied contractual right gives the student the right to continued enrollment free from arbitrary dismissal").

225. UDM-SOD arbitrarily dismissed John based on the false statements of Andersen and Student 1 that John was a "stalker," which was unsubstantiated and based solely on irrational reasons that had nothing to do with the safety of the campus or any person on campus. *See supra* ¶¶ 44-52, 55-56, 61, 133-134.

226. As a direct and proximate cause of the above conduct, Doe has sustained tremendous damages including, without limitation, emotional and psychological distress, loss of

educational and extracurricular opportunities, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff, John Doe, prays for the following relief:

(a) That the Court declare that the Defendants' actions are unlawful and enter judgment against all Defendants in favor of Plaintiff.

(b) That Plaintiff recovers for actual damages, including lost economic opportunities, lost earning capacity, and consequential pecuniary losses that he would not have suffered but for Defendants' unlawful acts;

(c) That Plaintiff recovers compensatory damages for actual harm, including impairment of reputation, personal humiliation, emotional anguish and suffering, physical well-being, and psychological damage;

(d) That Plaintiff recovers treble or punitive damages, as by law allowed;

(e) That Plaintiff recovers attorneys' fees and legal costs, as by law allowed;

(f) That Plaintiff recovers pre-judgment interest, as by law allowed;

(g) That the Court award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated:**     **Bingham Farms, Michigan**
              **April 25, 2024**

                              **Respectfully submitted,**

                              ***Attorneys for Plaintiff John Doe***

                              **NESENOFF & MILTENBERG, LLP**

By: /s/ *Andrew T. Miltenberg*

**Andrew T. Miltenberg**
(***Pro Hac Vice* Forthcoming**)
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**

**Tara J. Davis**
(***Pro Hac Vice* Forthcoming**)
**Regina M. Federico**
(***Pro Hac Vice* Forthcoming**)
**Julie A. Sacks**
(***Pro Hac Vice* Forthcoming**)
**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**tdavis@nmllplaw.com**
**rfederico@nmllplaw.com**
**jsacks@nmllplaw.com**

**-and-**

**BOGAS & KONCIUS P.C.**

By: /s/ *Brian E. Koncius*

**Brian E. Koncius**
**31700 Telegraph Road, Suite 160**
**Bingham Farms, Michigan 48025**
**(248) 502-5000**
**bkoncius@kbogaslaw.com**