UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE

      Plaintiff,

                                  Case No. 24-cv-11106

v.                                     Honorable Linda V. Parker

UNIVERSITY OF DETROIT MERCY
SCHOOL OF DENTISTRY, AND
UNIVERSITY OF DETROIT MERCY,

      Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS (ECF No. 9)**

      Plaintiff John Doe brought this claim against Defendants the University of

Detroit Mercy ("UDM") and University of Detroit Mercy School of Dentistry

("UDM-SOD") (collectively "Defendants" or the "University") for his dismissal

from the University's dentistry program and the procedural processes preceding

the dismissal and his appeal.  (ECF No. 1 at PageID.1-2.)  Plaintiff alleges several

violations under Michigan law, including: (1) breach of contract; (2) breach of the

covenant of good faith and fair dealing; and (3) breach of implied understanding

precluding arbitrary dismissal from the dental program.  (*Id.* at PageID.31-38.)

      As Plaintiff's deadline to file an amended complaint is currently stayed

pending the Court's ruling on his motion for reconsideration, the Court continues

to refer to Plaintiff using the John Doe pseudonym for the purposes of this order.

(*See* ECF No. 17.)  This matter is currently before the Court on Defendants'

motion to dismiss.  (ECF No. 9.)  The motion has been fully briefed.  (ECF Nos.

14, 15.)  For the reasons discussed below, the Court **GRANTS** Defendants' motion

**IN PART** and **DISMISSES** Count I **WITH PREJUDICE**.

## I.    BACKGROUND

Plaintiff was a student in the Doctor of Dental Surgery program at UDM-

SOD from fall 2016 to February 2019.  (ECF No. 1 at PageID.3.)  On November

14, 2018, UDM-SOD issued a no-contact order (the "NCO") between Plaintiff and

a female student at UDM-SOD, Jane Roe.  (*Id.* at PageID.8, ¶ 51.)  Plaintiff later

admitted to violating the NCO.  (*Id*. at PageID.8, 15, 17.)  UDM-SOD also

reprimanded Plaintiff for misconduct against his other classmates.  (*Id*. at

PageID.9.)  In addition to the above incidents, another UDM-SOD student filed a

Title IX complaint against Plaintiff in December 2018, "alleging his involvement

in professional misconduct, specifically, bullying, intimidation, misuse of social

media, as reported by DS1 classmates based on his WhatsApp and text

messages."  (*Id*. at PageID.15) (quotations omitted).

In the background of Plaintiff's issues with his classmates was his struggle

with attention deficit hyperactivity disorder ("ADHD"), an issue of which he made

the University aware.  (*Id*. at PageID.4.)  UDM-SOD recommended a psychiatrist

2

who provided Plaintiff with counseling and treatment for his ADHD.  (*Id*.)  The side effects of the ADHD medication caused him to experience "episodes of mania and agitation . . . making him acutely aware, responsive, and overly talkative." (*Id*. at PageID.5.)

As a result of Plaintiff's reported misconduct and violation of the no-contact order, the University placed Plaintiff on an involuntary and indefinite leave of absence.  (*Id*. at PageID.15-16.)  The University advised Plaintiff that "he had failed to meet 'expected standards for Fitness for the Profession,'" in violation of UDM-SOD's academic policies.  (*Id*. at PageID.16.)  Accordingly, Plaintiff was later dismissed from the dentistry program "based on faculty and administrators' observations of [his] pattern of conduct." (*Id*. at PageID.20) (quotations omitted).   Plaintiff unsuccessfully appealed the University's decision to dismiss him.  (*Id*. at PageID.20-21.)

At all relevant times, UDM-SOD had in place an "Academic Policies Handbook" (the "Handbook") which contained the relevant academic policies for pre-doctoral students enrolled in UDM-SOD. (ECF No. 1, PageID.3, ¶ 16.)  The relevant portions and policies outlined by the Handbook are as follows:

> Students who engage in professional or academic misconduct, or who are deemed unfit for the practice of dentistry, are subject to discipline. The University has the right, at its discretion, to impose any penalty or combination of penalties in any order, depending on the severity of the misconduct or violation that has occurred. It is recognized that "progressive

3

discipline" is not required, and that immediate dismissal is an appropriate discipline for certain misconduct, regardless of whether there has been previous discipline.

(ECF No. 9-1, PageID.230.)

Once an instance of academic or professional misconduct is reported, the Associate Dean for Academic Administration has the option to pursue an informal resolution. (*Id.* at PageID.234.) Any involved party must be informed in writing of the proposed informal resolution. (*Id.*) Within five academic days, "any involved party shall have the right to reject the proposed resolution and to demand a formal Disciplinary Hearing." (*Id.* at PageID.234.)

If the informal procedure is not used, the formal disciplinary hearing process applies, and a hearing is held before a Hearing Panel. At the hearing, the student involved may hear the evidence against him and can question all witnesses. (*Id.*) The student is also permitted to respond to the allegations and be questioned by the committee. (*Id.*) Subsequently, the Hearing Panel makes a written recommendation to the Dean. (*Id.* at PageID.235.) The Dean then reviews the recommendation of the Hearing Panel and makes the final decision on what, if any, discipline will occur. (*Id.*)

The Associate Dean for Academic Administration may remove a student from classes for:

> an interim period pending an investigation, disciplinary proceedings or for purposes of obtaining a medical, psychiatric or psychological evaluation,

4

whenever the Associate Dean for Academic Administration determines that there is reasonable cause to believe that the continued presence of a student in class, clinic or on the University campus poses a threat or risk to him/herself, to patients or to others, or to the stability of normal University classes, clinic or functions.

(*Id.* at PageID.236.)

The student may request an appeal of the Dean's decision, in which case an Appeals Review Committee with be appointed. (*Id.* at PageID.220.) The Appeals Review Committee will convene and determine whether or not an appeal hearing will be granted. (*Id.*) An appeal may be based on substantial evidence not previously considered, significant bias by the Hearing Panel, significant procedural errors, or significant findings of inequity. (*Id.*)

## II.     STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555).

When reviewing a motion to dismiss, the court may consider "documents incorporated into the complaint by reference . . . and matters of which a court may take judicial notice" in addition to allegations in the complaint.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The court may consider "a document that is not formally incorporated by reference or attached to a complaint" when "[the] document is referred to in the complaint and is central to the plaintiff's claim."  *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999); *see also McLaughlin v. CNX Gas Co., LLC*, 639 F. App'x 296, 298 (6th Cir. 2016).

Although the Handbook and dismissal letter are not attached as exhibits to the complaint, a website link to the Handbook is included in the Complaint, the documents are repeatedly referred to in the Complaint, and they are central to Plaintiff's claims.  (ECF No. 1, PageID.3, 20, 21.)  Consequently, the Court finds it can properly consider the Handbook and dismissal letter when ruling on the instant motion to dismiss.

Finally, this matter is before the Court pursuant to diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Sitting in diversity, this Court applies the law of the

state in which it sits.  As the parties appear to concur that Michigan law applies to this dispute, the Court analyzes Plaintiff's claims under Michigan law.

## III.   ANALYSIS

### A. Breach of Contract (Count I)

To prevail on his breach of contract claim, Plaintiff must establish that: (a) a contract existed between himself and the University; (b) the University breached the contract; and (c) Plaintiff suffered damages as a result.  *McInerney v Detroit Trust Co.*, 271 N.W. 545 (Mich. 1937).

Plaintiff's breach of contract claim is based on the understanding that there is a general contractual relationship between students and the university in which they enroll, and that the Handbook established the terms of the contract.  (ECF No. 1, PageID.31.)  Specifically, he argues that "UDM-SOD created [an] express and implied contract when it offered, and John accepted, admission to UDM-SOD, and when John's payment of the required tuition and fees was accepted by UDM-SOD" and that the terms of that contract include the Handbook.  (ECF No. 1, PageID.32.)

The University's position is that the Handbook cannot constitute a contract under Michigan law, and even if it could, the Handbook explicitly states that it does not constitute an "express or implied contract."  (ECF No. 9, PageID.98.)

Plaintiff counters that the Handbook does constitute a contract, and he has alleged violations of specific provisions. (ECF No. 14, PageID.374.)

### a. Inapplicable Cases

Many of the cases cited by Plaintiff in support of the proposition that the Sixth Circuit recognizes a contractual relationship between students and universities are inapplicable as they do not involve the application of Michigan law, or the issue of the existence of a contract was uncontested.  For example, in *Doe v. Univ. of Dayton*, 766 F. App'x 275 (6th Cir. 2019) the parties did not contest the fact that the relationship between the student and the university was contractual, and more importantly, the Sixth Circuit applied Ohio law.

*Doe v. N. Michigan Univ.*, 393 F. Supp. 3d 683 (W.D. Mich. 2019) is likewise inapposite as it is unclear that the court applied Michigan law because the only cases cited in support of the proposition that "a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings" applied the law of other states.  393 F. Supp. 3d at 699 (citing *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011) (applying Tennessee law)); *Faparusi v. Case W. Rsrv. Univ.*, 711 F. App'x 269, 276 (6th Cir. 2017) (applying Ohio law).  Finally, the Court finds *Carlton v. Trustees of Univ. of Detroit Mercy*, No. 225926, 2002 WL 533885 (Mich. Ct. App. Apr. 9, 2002) to be largely inapplicable as in that case, it was undisputed that there

was a contractual relationship between the plaintiff and the defendant university.

2002 WL 533885 at *3.

### b.  Handbook as an Express Contract

Plaintiff alleges that there exists both an express and implied contractual

obligation between the parties.  (ECF No. 1, PageID.31.)  A contract may be

express or implied.  *McInerney,* 271 N.W. at 547.  An express contract has been

defined as "one in which the terms were openly uttered and avowed at the time of

the making" or "one where the intention of the parties and the terms of the

agreement are declared or expressed by the parties, in writing or orally, at the time

it is entered into."  *Id.*  (quotation marks and citations omitted).  The handbook is

alleged to be an express contract, but the Court finds that this argument is

foreclosed by the explicit disclaimer and general language of the handbook.

The Court notes that under Michigan law, a student handbook or other

similar materials may constitute a contract under certain circumstances.  The

Michigan Court of Appeals has recently considered this issue and the holding of

*Cuddihy v. Wayne State University Board of Governors*, 413 N.W.2d 692 (Mich.

Ct. App. 1987) in the case of *Allen v. Michigan State University*, No. 358135, 2024

WL 4982523 (Mich. Ct. App. Dec. 4, 2024). The *Allen* court made clear that

*Cuddihy* "does not state that student handbooks, course catalogs, or other

informational materials issued by a university can *never* create any type of

contractual obligations." *Allen*, 2024 WL 4982523 at *12 (emphasis added).

However, the *Allen* court did not definitively rule on the issue as it found there was

no contract due to the broad reservation of rights included in the catalog at issue.

*Id.* at *13.  As in *Allen*, this Court need not determine if a student handbook could

ever constitute a contract, as the disclaimer in the instant Handbook is dispositive.

The first page of the Handbook states that the "Handbook does not constitute

an 'express or implied contract' with students or residents." (ECF No. 9-1,

PageID.114.)  The Handbook further states that policies "may be modified,

amended, or deleted by School of Dentistry Faculty Assembly, Administration, or

the University at any time."  (*Id.*)

Michigan Court of Appeals decisions have repeatedly found that there is no

contractual relationship when the materials involved include disclaimers

comparable to the one at issue here.  *Allen*, 2024 WL 4982523 at *13; *Amaya v.

Mott Cmty. Coll.*, No. 186755, 1997 WL 33353479 at *2 (Mich. Ct. App. Mar. 7,

1997) (finding no contract based on school catalog which included a disclaimer

that it did not constitute a contract); *Lee v. Univ. of Michigan-Dearborn*, No.

284541, 2009 WL 1362617 (Mich. Ct. App. May 12, 2009); *Stenger v. Ferris State

Univ.*, No. 358050, 2024 WL 4985667 at *6 (Mich. Ct. App. Dec. 4, 2024).  As

stated by the Michigan Court of Appeals, even if Michigan "law recognized the

relationship between students and colleges as contractual, and we hold that it does

10

not, defendant's disclaimers negate the existence of an implied or express contract." *Amaya*, 1997 WL 33353479 at *2. The relevant language of these opinions, contrary to Plaintiff's argument, is not dicta as it was central to each of the holdings in those cases.

*Heurtebise v. Reliable Bus. Computers*, 550 N.W.2d 243 (Mich. 1996) is likewise directly on point. There, the Michigan Supreme Court found that a handbook did not constitute a binding contract as it included a reservation of rights. *Id.* at 247. Consequently, the employer was not entitled to rely on a binding arbitration provision. *Id*. The language in the handbook in *Heurtebise* is almost identical to the one at issue here, for example, it stated that "is important to recognize and clarify that the Policies specified herein do not create any employment or personal contract, express or implied" and the employer reserved the right to modify the handbook at its sole discretion. *Id*. Plaintiff's attempts to distinguish *Heurtebise* are unavailing, as previously discussed, the Court may consider the Handbook in ruling on a motion to dismiss. *See supra* Section II. The Court finds, in light of *Heurtebise* and subsequent Michigan Court of Appeals cases, the Handbook did not create an express contract.

Furthermore, the Court is not persuaded by Plaintiff's argument that this determination is inappropriate for the motion to dismiss stage. If it is clear that no contract was created on the face of a document, a court may rule on contract

11

formation at the motion to dismiss stage. *See Thomas v. Publishers Clearing House, Inc*., 29 F. App'x 319, 322 (6th Cir. 2002); *Helmus v. Chase Home Fin*., *LLC*, 890 F. Supp. 2d 806, 815 (W.D. Mich. 2012). Here, the Handbook disclaimers are unambiguous and when the Handbook is read in its entirety, it is clear that there was no meeting of the minds. Consequently, Plaintiff has failed to plead a breach of contract claim that is plausible on its face based on the Handbook.

## B. Breach of Implied Understanding Precluding Arbitrary Dismissal (Count III)

The question of the existence of an implied contract is a closer call. The Court interprets Plaintiff's claim for "breach of implied understanding precluding arbitrary dismissal" as a breach of implied contract claim.

> There are two kinds of implied contracts; one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended.

*Allen*, 2024 WL 4982523 at *9 (quoting *McInerney* 271 N.W. at 548).

The last time the Michigan Supreme Court definitively addressed the issue of an implied contract between a student and a university was in *Booker v. Grand Rapids Medical College*, 120 N.W. 589 (1909). The *Booker* court stated that "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." *Id*. at 591. However, *Booker* has since

12

been described by the United States Supreme Court as an "antiquated race discrimination decision" whose "principal holding has since been overtaken by events[.]"  *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222 n.7 (1985). However, the *Ewing* Court also conceded that a student may generally have an "implied contract right to continued enrollment free from arbitrary dismissal" without deciding the underlying state law issue.  *Ewing*, 474 U.S. at 223.  The parties have not cited, and the Court is unaware, of any recent Michigan court decisions citing *Booker* and reaching the issue of whether students have the right to be free from arbitrary dismissal under Michigan law.

Generally, the Michigan Court of Appeals has issued conflicting opinions on whether an implied contract exists between a university and a student matriculating at that university.  *Lee*, 2007 WL 2827828 at *10 (collecting cases); *Ghoshal v. Thomas M. Cooley L. Sch.*, No. 10-CV-888, 2012 WL 716143 (W.D. Mich. Feb. 17, 2012), *report and recommendation adopted*, No. 10-CV-888, 2012 WL 716138 (W.D. Mich. Mar. 6, 2012).  Most recently, in *Allen*, the Michigan Court of Appeals cited both *Booker* and *Ewing* for the proposition that a student may have the implied contractual right to be free from arbitrary dismissal, but the court ultimately did not reach the issue.  2024 WL 4982523 at *12.

In *Maitland v. Wayne State University Medical School*, 257 N.W.2d 195 (Mich. Ct. App. 1977) the Michigan Court of Appeals implicitly found a right to be

13

free from arbitrary dismissal and stated that where an error of this kind is found, "the remedy should be to refer the matter to the academic or administrative body for a proper hearing." *Rolfe v. Baker College*, No. 340158, 2019 WL 2016026 (Mich. Ct. App. May 7, 2019) also did not squarely address the issue of an implied contract as there was an express behavior contract at issue. *Amaya* explicitly held that Michigan does not recognize the relationship between students and universities as contractual, yet it did not cite *Booker* and the reasoning primarily relied on *Cuddihy*. 1997 WL 33353479 at *2.

However, if such an implied right exists, it is clear that it is limited to the student's right to be free from arbitrary dismissal. *Carlton v. Trustees of Univ. of Detroit Mercy*, No. 225926, 2002 WL 533885 at *3 (Mich. Ct. App. Apr. 9, 2002). For example, in *Carlton* it was uncontested that there was an implied contract between the University and the dismissed student, and the *Carlton* court cited *Ewing* for the proposition that such an implied contractual right exists. *Id.* at *3. However, part of the *Carlton* court's reasoning in finding the decision to not be arbitrary or capricious was the fact that the university substantially "followed the procedures and policies as outlined by the student handbook when they dismissed plaintiff from the program." *Id.* at *3. Furthermore, the *Carlton* decision was made at the summary judgment stage.

14

As Plaintiff notes, other jurisdictions address this issue by treating

handbooks as the terms of the implied contract which helps determine if dismissal

is arbitrary. *See Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005)

(explaining that provisions of a university's student handbook may be enforced as

an implied contract); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 890 (M.D. Tenn.

2018).

As previously noted, this is an arguably unsettled area of state law. As the

Court is sitting in diversity and none of the limited exceptions apply, abstention is

inappropriate. *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 191 (1959).

Consequently, as there are conflicting Michigan Court of Appeals decisions, the

Court must choose between the competing reasonings. Based on *Maitland*, *Allen*,

and *Booker*, the Court finds that were the Michigan Supreme Court to consider this

issue, it would recognize an implied contract right to be free from arbitrary

dismissal from a university.

### a. Arbitrary and Capricious

"A trial court may review a university's actions only to determine if they are

so arbitrary and capricious as to warrant the court's interference in the matter."

*Carlton,* 2002 WL 533885 at *2 (citing *Maitland*, 257 N.W.2d at 195).

> The standard for evaluating whether conduct is arbitrary and capricious is
> well-defined under Michigan law. Arbitrary is defined as "without adequate
> determining principle . . . fixed or arrived at through an exercise of will or
> by caprice, without consideration or adjustment with reference to principles,

15

circumstances, or significance . . . decisive but unreasoned." *In re Pendleton,* 2008 WL 400694 at *1 (Mich. Ct. App., Feb.14, 2008). Capricious is defined as "apt to change suddenly; freakish; whimsical; humorsome." *Id.*

*Ghoshal*, 2012 WL 716143 at *3.

When deciding whether an academic decision was arbitrarily made, the Supreme Court has cautioned judges to "show great respect for the faculty's professional judgment." *See Ewing,* 474 U.S. at 225.  The *Ewing* Court further cautioned judges to override such decisions only where they reflect "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.*

Plaintiff argues his dismissal was arbitrary as it was "based on the false statements of Andersen and Student 1 that John was a 'stalker,' which was unsubstantiated and based solely on irrational reasons that had nothing to do with the safety of the campus or any person on campus."  (ECF No. 14, PageID.385.) The University responds that the review process identified in the Complaint establishes that Plaintiff was not arbitrarily dismissed from the University.  (ECF No. 15, PageID.393.)  The Court also notes that the dismissal letter merely states that based on "faculty and administrators' observations of [John Doe's] pattern of conduct" dismissal was required.  (ECF No. 9-2, PageID.298.)

16

The Court finds that the University's policies, as outlined in the Handbook, are relevant to the question of whether the dismissal was arbitrary. The Court is concerned by the University's alleged failure to comply with its own policies as set forth in the Handbook and finds that this failure weighs heavily in favor of finding that the decision was arbitrary. Namely, the fact that no hearing or formal discussion was held and communication with Plaintiff regarding the dismissal did not clearly state the reason for the dismissal. However, the University made no representation that it intended to be bound to the strict requirements outlined in the Handbook. Consequently, the University need only show that its decision was not arbitrary and capricious, such that it was a "a substantial departure from accepted academic norms[.]" *Ewing,* 474 U.S. at 225.

Plaintiff specifically alleges that he was dismissed from the dental program after violating the NCO and being placed on an involuntary leave of absence. (ECF No. 1, PageID.15.) Plaintiff was ultimately dismissed as "unfit" for the dental profession without the opportunity for a hearing or Standing Academic Performance Committee review. (*Id.* at PageID.21.) However, the University did appoint an Appeals Review Committee to review Plaintiff's request for an appeal. (*Id.* at PageID.20.) Furthermore, Plaintiff had multiple conversations with University staff about his conduct. However, Plaintiff did not have the opportunity for a hearing or a formal opportunity to argue against his dismissal.

17

In *Ghoshal*, the court found the decision to dismiss a student was not arbitrary and capricious as it "was made only after an investigation, an evidentiary hearing, and several levels of review and reconsideration." *Ghoshal*, 2012 WL 716143 at *3. Such process was not present here, where Plaintiff did not have the benefit of an underlying hearing of any kind which was capable of review.

Due to the limited nature of Michigan case law on arbitrary dismissal from private universities where a hearing is not present, the Court looks to the procedural due process context for further clarification. In the Sixth Circuit, "dismissing a medical student for lack of professionalism is academic evaluation" which is sometimes entitled to due process protection. *Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1005 (E.D. Mich. 2017) (citing *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355, 360 (6th Cir. 2015)). The Court finds that for these purposes, medical and dental school are comparable. "Where dismissals are considered academic in nature, procedural due process does not require a hearing before a decision making body either before or after the termination decision is made." *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012). Rather, "when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003).

Meanwhile, "[d]isciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians," require higher standards of protection.  *See Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005).  "The hearing, whether formal, informal, live or not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.'"  *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005).  To be clear, the Court does not apply due process case law to the instant case at hand.  It merely looks to other circumstances of dismissals from universities to evaluate what is generally viewed as reasonable in this context, to inform a decision on what is arbitrary.

Here, Plaintiff's dismissal was arguably disciplinary as it was primarily based on the violation of the NCO.  Although portions of the dismissal seem to be due to failure to comply with standards of professional conduct, there are also significant allegations of misconduct.  Consequently, the reasoning justifying a heightened level of deference to the University applies with slightly less force as the dismissal was not purely academic in nature.

In this case, Plaintiff was given the opportunity to write multiple letters discussing the issue, admitted to violating the NCO, and had his dismissal decision reviewed by an Appeals Review Committee.   However, no hearing was held, and it is unclear if Plaintiff had an opportunity to hear the reasons for his dismissal and

provide argument against it.  As a result, even viewing the facts with a substantial degree of deference to the University, the Court cannot determine at this early stage of the litigation that the decision to dismiss Plaintiff was not arbitrary. Consequently, the University's motion to dismiss Count III is **DENIED.**

### b.  Good Faith and Fair Dealing

Finally, the University's sole argument as to Plaintiff's claim for breach of the covenant of good faith and fair dealing (Count II) is that there cannot be a claim for breach of the covenant absent a valid, enforceable contract.  *Rodgers v. JPMorgan Chase Bank NA*, 890 N.W.2d 381, 387 (Mich. Ct. App. 2016) (holding the covenant of good faith and fair dealing is only applicable if there is a valid, enforceable contract); *Rolfe,* 2019 WL 2016026 at *6.  As the Court finds that Plaintiff has plausibly pleaded the existence of an enforceable contract, the motion to dismiss Count II is **DENIED.**

## IV.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendants' motion to dismiss (ECF No. 9) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Count I is **DISMISSED WITH**

20

**PREJUDICE**.

**SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 31, 2025